UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JOSEPH MANERI,

                               Plaintiff,                      **REPORT &**
                                                         **RECOMMENDATION**
                  -against-                        CV 17-0322 (ADS) (GRB)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                                Defendant.


----------------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

       Plaintiff Joseph Maneri ("plaintiff") commenced this civil action pursuant to the Social

Security Act, 42 U.S.C. § 405(g) seeking judicial review of a final decision of defendant Nancy

A. Berryhill (the "Commissioner" or "defendant"), the acting commissioner of the Social

Security Administration ("SSA") at the time of filing, which denied his application for disability

insurance benefits.  Presently before the undersigned, upon the referral of the Honorable Arthur

D. Spatt for Report and Recommendation, are the parties' cross-motions for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set

forth below, the undersigned respectfully recommends that the district court deny plaintiff's

motion for judgment on the pleadings, deny the Commissioner's cross-motion for judgment on

the pleadings, and remand the case to the ALJ for further proceedings.

## BACKGROUND

1. **Procedural History**

   **A. Administrative History**

Plaintiff filed a Title II application for Social Security Disability Benefits on December 31, 2013, alleging disability due to lumbar and cervical radiculopathy as of March 15, 2011.  Tr. at 124, 225-28, 235-36.[1]  Plaintiff's application for benefits was denied on April 3, 2014, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  *Id*. at 124, 127-28.  ALJ Ronald Waldman conducted hearings on November 16, 2015 and April 14, 2016 during which plaintiff was represented by counsel and testified.  *Id*. at 54-116.  In addition, a medical expert and vocational expert testified at the hearings.  *Id*.

On June 1, 2016, the ALJ issued a decision (the "ALJ Decision") finding that plaintiff was not disabled, as defined in the Social Security Act, at any time from March 15, 2011, the alleged onset date, through December 31, 2014, the date last insured, and therefore was not entitled to disability insurance benefits.  *Id*. at 38-53.  On November 29, 2016, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  *Id*. at 1-7.

   **B. The Instant Case**

Plaintiff commenced this lawsuit on January 20, 2017.  DE 1.  On August 19, 2017,

---

[1] References to "Tr." are the Transcript of the Administrative Record filed in this case.

plaintiff moved for judgment on the pleadings.  DE 19.  The Commissioner submitted a cross-motion for judgment on the pleadings on November 20, 2017.  DE 23.  On February 28, 2018, the district court referred the cross-motions for judgment on the pleadings to the undersigned for report and recommendation.  DE 27.

## II.    Factual Background

### A. Non-Medical Evidence

Plaintiff was born on April 23, 1959, and he completed two years of college in 1982.  Tr. at 225, 239.  Plaintiff worked as a New York transit police officer until December 1985, when he was given disability retirement benefits based on non-service related lumbar radiculopathy.  *Id*. at 412-15, 421-22.  From January 1994 to March 2007, plaintiff owned a real estate company that specialized in bank foreclosures.  *Id*. at 59, 88, 239.  From 2007 to 2009, plaintiff invested in and sold real estate, and from March 2009 to March 2011, he worked as a restaurant manager at J & R Steakhouse in Islip, New York, until he fell on ice and aggravated prior injuries.  *Id*.  In 2013 and 2014, plaintiff tried to start a real estate company and performed some real estate and restaurant consulting work.  *Id*. at 99-100.   In 2015, plaintiff engaged in unpaid consulting work to try to "build some relationships," and as of April 2016, he still possessed a real estate broker's license.  *Id*. at 58, 99.

In a function report dated February 14, 2014, plaintiff stated that he lived alone in a house.  *Id*. at 245-55.  During the day, plaintiff regularly showered, cooked, read, cleaned his home, did laundry, washed dishes, fed his fish, ran errands, drove his car, socialized, and used a computer.  *Id*. at 246-50.  Aside from bi-monthly help to clean his fish tank, plaintiff reported

that he did not have help doing household chores[2].  *Id*. at 246, 248.  Although he had pain on occasion when dressing or bathing, plaintiff stated that his condition did not affect his ability to care for his personal needs and grooming.  *Id*. at 246-47. Plaintiff went outside every day and travelled by either walking or driving.  *Id*. at 245-55.   Once a week, he would shop in stores and socialize with friends, but went out less than before.  *Id*. at 249-50.   Plaintiff reported that his condition had not affected his ability to get along with others, follow instructions, pay attention, finish what he started, use his hands, handle money or pay bills.  *Id*. at 249-51.

Plaintiff stated that he started having pain following an accident at work in 1984-85, and described his condition as low back pain, radiating to his legs and constant pain and soreness in his neck.  *Id*. at 253.  He does not use any assistance devices, such as a back brace or cane, but to relieve the pain, plaintiff sleeps with a pillow between his legs and uses an inversion table and Jacuzzi.  *Id*. at 251, 255.  Since 2011, he takes Ibuprofen, as needed, to help manage the pain.  *Id*. at 254.  Plaintiff indicated that he does not lift anything unless necessary and does not squat or kneel.  *Id*. at 250-51.  He reported difficulty sleeping, sitting and standing for long periods, but stated that walking and climbing stairs were easier.  *Id*. at 246, 250-51.

At a video hearing before ALJ Waldman on November 16, 2015, plaintiff testified from Florida.  *Id*. at 92-116.  He reported that he had driven himself 45 minutes to the hearing.  *Id*. at 93-94, 108-09.  Plaintiff explained that he had driven to Florida to spend the winter, which took him two days.  *Id*. at 93-96.  After he completed the drive, he spent a few days in bed.  *Id*. at 97.

---

[2] At his hearing before the ALJ, plaintiff testified that he paid someone to clean the kitchen and bedroom.  *Id*. at 111-12. 115.

Plaintiff testified that the last time he had worked was in March 2011, and because he aggravated prior injuries to his back and neck when he fell on the ice in the winter of either 2009 or 2010, he eventually quit his job. *Id*. at 97-99. He explained that thereafter he did consulting work and sometimes experienced some "mental cloudiness" from his impairments. *Id*. at 100-01. Plaintiff testified that he did not seek medical treatment for his neck in Florida but used a hot tub, an inversion table, and a massage once a month for therapeutic relief. *Id*. at 104-06. The last time he got chiropractic treatment was in 2013, and in September 2015, Dr. Seth Grossman, an orthopedist, prescribed Tramadol and Diclofenac, which plaintiff took as needed. *Id*. at 106. He stated he could bend at the waist to "some point," comfortably lift and carry ten to twelve pounds, walk eight to ten minutes, and sit for eight to twenty minutes. *Id*. at 109-06.

On April 14, 2016, plaintiff testified in person at a continued disability hearing before ALJ Waldman in Long Island, New York. *Id*. at 54-89. In addition, Louis A. Fuchs, a medical expert, and Esperanza DiStefano, a vocational expert, testified at the hearing. *Id*. Plaintiff reported that he had driven himself to the hearing, did not have a handicap parking pass, and the month before had driven from Florida back to New York, which again took two days. *Id*. at 57, 63, 68. He explained that he stopped every hour during the drive. *Id*. at 67. Plaintiff told the ALJ that he received a police pension of $1,235.00 per month and possessed a real estate broker's license. *Id*. at 58. He related that he had lower back pain that radiated down his left leg and cervical pain, and continues to use an inversion table and hot tub for therapeutic relief. *Id*. at 63, 65. Since he returned from Florida in February 2016, plaintiff resumed chiropractic treatment, commenced physical therapy, and changed his medication from Tramadol to 800 mg

Ibuprofen for pain and Metaxalone, a muscle relaxant. *Id*. at 64.

Plaintiff reported that when he was in Florida from October 1, 2015 to February 1, 2016, he did not get treatment because he was not covered by insurance, did not use a cane or back brace, denied difficulty with balance and stability, and could bend at the waist with pain. *Id*. at 66-7. He testified that he could lift ten to twelve pounds, walk three to four minutes, sit ten to fifteen minutes, and enjoyed cooking for himself and friends. *Id*. at 67-69.

### B. Medical Evidence/Treating Physicians

#### 1. Medical Evidence Prior to Alleged Onset Date: 3/15/11

##### a. Zilkha Radiology

A cervical spine x-ray performed on plaintiff on January 21, 2011 indicated degenerative disc disease from C5 to T1 with identification of disc space narrowing and anterior osteophytes; a narrowing of the neural foramen at C6-C7 on the left side secondary to uncinated process osteophytes; and a narrowing of the neural foramen from C4-C6 on the right side. *Id*. at 300. In addition, indeterminate small radiolucency in the posterior calvarium was noted and an x-ray of the skull was recommended. *Id*. A subsequent x-ray of the radiograph skull performed on January 22, 2011 revealed a small lucency within the posterior calvarium on the right side. *Id*.

##### b. Ruth G. Diaz, M.D.

In April 2010, plaintiff saw Dr. Diaz, his primary care physician. *Id*. at 326-29, 336; *see also id.* at 305-26 (earlier treatment records in 1999). She noted his medications as Exforge, Allegra, Nasonex and Astepro. *Id*. at 327. In May and August 2010, plaintiff's blood pressure was good, and in September 2010, Dr. Diaz indicated that she was considering orthotics for

plaintiff's feet. *Id*. at 328-29. On January 24, 2011, plaintiff complained of right shoulder pain and an inability to raise his arm above his shoulder, did not want to see an orthopedic doctor but would see a chiropractor, and Dr. Diaz prescribed Percocet for pain. *Id*. at 330.

### c. John Chinnici, D.C.

On December 17, 2010, plaintiff had a chiropractic consultation with Dr. Chinnici for left-sided low back pain. *Id*. at 477-78, 494. On examination, Dr. Chinnici reported his sensation was normal, motor strength was full (5/5) in the upper and lower extremities, range of motion was reduced, and there was tenderness in the lumbar spine. *Id*. Dr. Chinnici assessed left-sided lumbar radiculopathy and referred plaintiff for radiographic examination. *Id*. Plaintiff returned on December 22 and 23, 2010, and Dr. Chinnici noted that lumbar x-rays showed minimal spondylitic changes. *Id*. at 478-79.

On January 21, 2011, plaintiff complained of right shoulder pain following a fall on his right shoulder, and Dr. Chinnici ordered cervical spine x-rays. *Id*. at 479. On examination, there was tenderness in the right acromioclavicular joint and cervical thoracic region, and cervical range of motion was restricted. *Id*. Plaintiff's neurological examination was normal, and Dr. Chinnici assessed cervical and right shoulder sprain/strain. *Id*. Plaintiff continued chiropractic treatment for his right arm and cervical spine through February 19, 2011, at which point Dr. Chinnici noted overall improvement. *Id*. at 479-84.

### 2. Medical Evidence During the Relevant Period: 3/15/11 to 12/31/14

### a. Zilkha Radiology

A skeletal study and x-rays performed on March 16, 2011 indicated nonspecific solitary lytic lesion of the posterior right parietal bone and noted deformity and degenerative disease of the cervical spine.  *Id*. at 445, 447.  A subsequent skeletal x-ray performed March 31, 2014, revealed that a small lucent lesion in the right posterior parietal lobe was unchanged since the original study performed in January 2011.  *Id*. at 511.

### b.  Edward Samuel, M.D. and Nurse Practitioner Janet Badalementi

On April 6, 2011, Dr. Samuel and NP Badalementi conducted an initial oncology examination on plaintiff at NorthShore Hematology/Oncology Associates.  *Id*. at 442-44.  They reported that plaintiff's history of his present illness included an injury to his shoulder following a fall on the ice in January 2011.  *Id*. at 442.  Cervical spine x-rays indicated an indeterminate lesion rooted in the calvarium, and a subsequent CT scan of the brain confirmed the lesion, but a bone scan showed no lesion in the skull.  *Id*.  Plaintiff denied any medical complaints except for continued right shoulder pain for which he was seeing a chiropractor.  *Id*.  Dr. Samuel noted that plaintiff was fully active and able to carry on all pre-disease performance without restriction.  *Id*. at 443.  Plaintiff denied muscle pain and stiffness, and his neck, neurological, musculoskeletal and extremities examination findings were unremarkable.  *Id*.  Dr. Samuel assessed a possible solitary plasmacytoma and ordered further blood test to rule out multiple myeloma.  *Id*.

During a follow up examination on May 20, 2011, Dr. Samuel reviewed his bloodwork and assessed plasmacytoma and solitary lytic lesion on skull.  *Id*. at 436-38.  Examination findings, including neck, neurological, musculoskeletal and extremities were unremarkable.  *Id*. at 437.  Plaintiff denied having any complaints.  *Id*. at 436.

8

Plaintiff returned to Dr. Samuel on February 1, 2012 and March 9, 2012, and examination findings of plaintiff's neck, neurological, musculoskeletal and extremities were unremarkable. *Id*. at 433-35, 430-32. Dr. Samuel reported that plaintiff was fully active and able to carry on pre-disease performance without restriction. *Id*. On March 7, 2013, a review of plaintiff's systems was normal, and although he reported joint pain in the right shoulder, plaintiff stated he had no pain or stiffness. *Id*. at 430-31. Dr. Samuel again reported that there were no musculoskeletal weakness, and plaintiff was fully active and able to carry on pre-disease performance without restriction. *Id*. at 437.

### c. John Chinnici, D.C.

On March 26, 2011, plaintiff informed Dr. Chinnici that apart from feeling soreness in the morning after sleeping on the right side, his right shoulder complaints appeared to be essentially resolved, and overall he was markedly improved with treatment rendered to date. *Id*. at 437. Dr. Chinnici noted right paracervical and upper thoracic spine stiffness and tightness, and assessed postacute cervical sprain/strain complicated by degenerative disc disease in the cervical region. *Id*. at 437.

Plaintiff continued chiropractic treatment through July 11, 2011, and following each examination Dr. Chinnici assessed postacute cervical sprain/strain complicated by degenerative disc disease in the cervical region. *Id*. at 484-90. According to Dr. Chinnici's notes, plaintiff reported some improvement in his condition. On April 9, 2011, Dr. Chinnici recorded right cervical thoracic stiffness and tightness on an intermittent basis predominantly aggravated by plaintiff's increased activities of daily living, and examination revealed continued significant

9

forward head translation.  *Id*. at 485.  On April 16, 2011, plaintiff reported he had moved furniture at his home.  *Id*. at 485-86.  Dr. Chinnici noted immediate right cervical thoracic and interscapular tightness and soreness, and examination indicated continued significant forward head translation.  *Id*.  On April 30, 2011, Dr. Chinnici recorded occasional right cervical thoracic and interscapular tightness and soreness, and examination revealed continued forward head translation though less dramatic than previously noted.  *Id*. at 486.  On May 9, 2011, plaintiff complained of intermittent cervical thoracic stiffness and tightness bilaterally, more acutely on the right side, although he reported that with therapeutic exercises he was noting improvement.  *Id*. at 486-87.  On May 14, 2011, Dr. Chinnici noted sporadically cervical thoracic and interscapular tightness with progressive improvement especially with forward flexion while reading and with prolonged standing.  *Id*. at 487.

On June 4, 2011, Dr. Chinnici noted plaintiff's improvement in the cervical thoracic region with decreasing pain and improved ranges of motion.  *Id*. at 487-88.  On June 18, and 25, 2011, Dr. Chinnici reported that plaintiff's use of an inversion table temporarily relieved his intermittent cervical thoracic stiffness and low back soreness.  *Id*. at 488-89.  On July 16, 2011, Dr. Chinnici noted that plaintiff's cervical and thoracic stiffness was improved.  *Id*. at 489.  Throughout June and July 2011, Dr. Chinnici assessed postacute cervical brachial sprain/strain complicated by degenerative disc disease in the cervical region.  *Id*. at 488-89.

Nearly two years later, plaintiff returned to Dr. Chinnici on May 20, 2013 and reported a sudden onset of lower cervical midline pain.  *Id*. at 490.  Examination findings revealed tenderness throughout the paracervical region with active myofascial trigger points, positive

10

foraminal compression when performed in extension, cervical spine pain, full flexion in the cervical spine, but reduced rotation, lateral flexion and extension. *Id*. Sensory and motor testing were normal in the upper extremities, and Dr. Chinnici assessed right-sided cervical radiculopathy with degenerative disease of the cervical region. *Id*. During May and June 2013, plaintiff saw Dr. Chinnici for seven chiropractic visits, and while plaintiff reported cervical spine pain and stiffness, he noted progressive improvement with treatment. *Id*. at 488-89.

On November 11, 2013, plaintiff returned to Dr. Chinnici and reported that over the last several months, he noted a dull, aching lumbosacral pain, especially in the mornings. *Id*. at 492-93. When plaintiff saw Dr. Chinnici on November 13, 2013, he reported that while he continued to experience low back pain, his left side was improved. *Id*. Dr. Chinnici's clinical impression was lumbar facet syndrome with degenerative disease. *Id*.

### d.  Ruth G. Diaz, M.D.

On January 13, 2013, plaintiff saw Dr. Diaz for a sore throat, and on August 9, 2012 for the flu. *Id*. at 331-32. On January 10, 2013, Dr. Diaz gave plaintiff a flu vaccine, and on May 30, 2013, plaintiff reported that he had stopped drinking alcohol. *Id*. at 333. On September 12, 2013, Dr. Diaz recorded that plaintiff did not have diabetes. *Id*. at 334. On November 6, 2013, Dr. Diaz noted that plaintiff's blood pressure was controlled and prescribed Restoril because he reported that Ambien did not help his insomnia. *Id*. at 335.

On December 12, 2013, Dr. Diaz recorded that plaintiff had cervical and lumbar radiculopathy, and on December 16, 2013, she completed a medical assessment of ability to do work related activities. *Id*. at 335, 497-99. Based on a chiropractic evaluation, Dr. Diaz noted

11

plaintiff had cervical radiculopathy as of June 2013 and lumbar spine degenerative disc disease as of November 2013.  *Id*. at 497.  Dr. Diaz opined that in an eight-hour workday, plaintiff could: (i) stand and walk three to four hours (and one hour without interruption); (ii) sit for four hours (one hour without interruption); and (iii) lift and carry eight to ten pounds occasionally.  *Id*. at 497-98.  In addition, he could occasionally climb, stoop, kneel, balance and crouch.  *Id*. at 498. Dr. Diaz found that plaintiff did not have any limitations with regard to the physical functions of reaching, feeling, handling, pushing, pulling seeing, hearing and speaking, and no environmental limitations.  *Id*. at 499.  During July and September 2014, plaintiff saw Dr. Diaz to monitor his blood pressure, which she reported was under good control.  *Id*. at 517-19.

### e.  Igor Kravets, M.D.

Dr. Diaz referred plaintiff to Dr, Kravets, an endocrinologist, for an endocrinology consultation based on his complaints of episodes of "fogginess" since he had stopped using alcohol.  *Id*. at 296-99.  On July 17, 2013, Dr. Kravets examined plaintiff and reported that a neurological and neck examinations were unremarkable, plaintiff had a history of alcohol abuse, and had been sober for 13 weeks.  *Id*.

### f.  Leigh Hutchinson, M.D.

On September 17, 2013, plaintiff saw Dr. Hutchinson, a cardiologist, for a routine cardiac evaluation.  *Id*. at 472-75.  Plaintiff told him he had lost 38 pounds since he stopped drinking alcohol and denied chest pain, palpitations, syncope, dizziness, dyspnea and edma.  *Id*.  Dr. Hutchinson noted that upon physical examination, his gait and station were normal, his spine showed normal alignment and mobility, he was not in any acute distress and his cardiac

12

examination was unremarkable.  *Id*.  Based on his family history and a borderline abnormal ECG, Dr. Hutchinson recommended an echocardiogram and treadmill exercise stress test.  *Id*.

### g.  Seth Grossman

On May 20, 2014, Dr. Grossman, an orthopedic surgeon at Orlin & Cohen Orthopedic Associates, LLP, examined plaintiff as a new patient.  *Id*. at 545-47.  Plaintiff reported low back pain with radiation down the left leg and neck stiffness which affected his ability to sleep, and stated he used a hot tub, inversion table, Ibuprofen and chiropractic treatments to manage the pain.  *Id*. at 545.  Dr. Grossman recorded that lumbar spine x-rays showed disc space narrowing, mild degenerative disc disease, and spurring at L4-L5.  *Id*. at 546.  Dr. Grossman reported that the range of motion in plaintiff's neck and cervical spine was normal, neurological testing was within normal limits, his gait was normal and his coordination was intact.  *Id*.  Plaintiff's range of motion in his back, however, was diminished.  *Id*.  Manual muscle testing was greater than or equal to 4+/5, and reflexes, sensation and pulses were intact in the bilateral lower extremities. *Id*.  Dr. Grossman diagnosed lumbago and degenerative disc disease of the lumbar spine, and recommended continued conservative treatment.  *Id*. at 546-47.

Plaintiff had a follow up visit with Dr. Grossman on July 29, 2014.  *Id*. at 542-44.  Since his prior visit, plaintiff reported that physical therapy was only minimally helpful but that continued chiropractic treatments, massage therapy, use of an inversion table and home exercise were helpful, and his overall pain was manageable.  *Id*. at 542.  Plaintiff denied numbness, tingling, weakness or radiating pain in his arms.  *Id*.  A cervical spine exam, Hoffman exam and spurling exam were normal, manual muscle testing of the bilateral upper extremities was greater

than or equal to 4+/5 strength, and a nuerological exam was normal. *Id*. at 542-43. Plaintiff's range of neck motion and back motion was diminished. *Id*. at 543. An x-ray examination of the cervical spine showed disc space narrowing. *Id.* Dr. Grossman diagnosed lumbago and degenerative disc disease of the lumbar spine, noted that plaintiff had daily pain but was managing, and recommended that he continue conservative management, physical therapy/ chiropractic treatment and NSAIDS as needed. *Id*. at 544.

### h.  Michael Guido, M.D.

On June 20, 2014, plaintiff saw Dr. Guido, a neurologist, and reported that his past medical issues, including, mental confusion, insomnia, alcohol abuse had been resolved. *Id*. at 514-16. Plaintiff reported that he was seeing a new psychiatrist who was treating him for agoraphobia and insomnia with Amitriptyline to good effect. *Id*. at 514. Plaintiff's review of systems was negative for musculoskeletal concerns. *Id*. at 515. His muscle tone and bulk were normal, he had full (5/5) power bilaterally, his gait was narrow based and balanced, and his coordination was intact. *Id*. at 515-16. Dr. Guido reported that plaintiff's insomnia and concentration had improved, and he prescribed aspirin for stroke prophylaxis. *Id*. at 516.

### 3.  Medical Evidence After Plaintiff's Date Last Insured: 12/31/14

### a.  Dr. Diaz, M.D.

Plaintiff returned to Dr. Diaz on July 8, 2015, and she noted that plaintiff had good blood pressure. *Id*. at 518.

### b.  Dr. Grossman, M.D. and Michelle Petrosonic, P.A.

On August 25, 2015, plaintiff saw Michelle Petrosonic, a physician assistant in Dr. Grossman's office at Orlin & Cohen Orthopedic Associates, LLP, and reported he was experiencing neck and joint pain.  *Id*. at 540-41.  On examination, his range of motion of the cervical spine was very limited.  *Id*. at 540.  Plaintiff had full strength and intact sensation in his upper extremities.  *Id*.  PA Petrosonic diagnosed cervical degenerative disc disease and cervical spinal stenosis and referred plaintiff to physical therapy.  *Id*. at 540-41.

Plaintiff followed up with Dr. Grossman on September 22, 2015, and he reported that physical therapy was helpful, but that he experienced increased stiffness/soreness in his neck afterwards.  *Id*. at 537-39.  Dr. Grossman noted that plaintiff suffers from neck, back and joint pain.  *Id.* at 538.  The examination of his cervical spine indicated bilateral trapezial spasm, bilateral rhomboid spasm and bilateral paracervical spasm and the range of motion of the cervical spine was very limited in all directions with pain.  *Id.*  Dr. Grossman assessed cervical and lumbar degenerative disc disease, lumbago, and cervical spinal stenosis and recommended plaintiff continue conservative treatment, including physical therapy and home exercise.  *Id*. at 538-39.

### c.  Andrew Tarleton, M.D.

Plaintiff saw Dr. Tarleton, an orthopedic surgeon at Orlin & Cohen Orthopedic Associates, LLP, on March 23, 2016 for back pain and worsening neck pain.  *Id*. at 573-76.  Cervical spine x-rays indicated significant degenerative disc disease from C5-C7 and facet arthritis, and lumbar spine x-rays showed no signs of instability.  *Id*. at 573.  On examination, plaintiff had spasm and very limited range of motion in his cervical spine and diminished range

15

of motion of the thoracic and lumbar spine. *Id.* at 575. In his upper extremities, he had full strength and intact sensation. *Id.* Dr. Tarleton assessed lumbago, lumbar and cervical degenerative disc disease, cervical spinal stenosis and thoracic back pain. *Id.* He ordered a cervical spine MRI, recommended continued physical therapy and home exercise, and prescribed Ibuprofen and Skelaxin. *Id.* at 575-76.

### d. Dr. Chinnici, D.C.

Plaintiff returned to Dr. Chinnici on March 9, 2016 for neck pain and stiffness. *Id.* at 577. Dr. Chinnici diagnosed plaintiff with cervicobrachial syndrome and cervical disc degeneration and reported that post-treatment, plaintiff had improved range of motion and had tolerated the treatment well. *Id.* Plaintiff continued to see Dr. Chinnici for eight more chiropractic treatments throughout March 2016. *Id.* at 577-81. Post treatment, Dr. Chinnici assessed improvement in plaintiff's cervical spine range of motion and subjective complaints. *Id.*

### C. Medical Evidence/Non-Treating Sources

#### 1. Ammaji Manyam, M.D.

On March 24, 2014, Dr, Manyam, an internist, conducted a consultative medical examination on plaintiff. *Id.* at 500-04. Plaintiff reported constant back and neck pain since December 1983, stated that he could not move his neck up, down or side to side without pain, and indicated his current medications were Ramipril, Elavil, Ibuprofen and aspirin. *Id.* at 500. With respect to his daily living activities, plaintiff reported that he cooked three times per week, cleaned, did laundry and shopped once a week, showered and dressed independently, watched

16

television, listened to the radio, and read magazines. *Id*. at 501. A physical examination revealed no acute distress, normal gait and stance, and no difficulty walking, squatting, changing for his examination, getting on or off the examination table, or rising from a chair. *Id*. Additionally, he did not use any assistive devices. *Id*.

Plaintiff's cervical spine and lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. *Id*. at 502. There was no scoliosis, kyphosis or abnormality of the spine. *Id*. Straight leg raising was negative bilaterally, and plaintiff had full ranges of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles. *Id*. Deep tendon reflexes and sensation were normal in his upper and lower extremities, his strength was full (5/5) in upper and lower extremities, and there was no evidence of sensory deficit or muscle atrophy. *Id*. Plaintiff's hand and finger dexterity was intact, his grip strength was full (5/5) bilaterally and his extremities were unremarkable. *Id*. Lumbar x-rays indicated mild degenerative spondylosis at L4-L5, straightening, and no compression fracture. *Id*. at 504.

Dr. Manyam diagnosed neck pain secondary to degenerative arthritis, musculoskeletal back pain and hypertension and reported that plaintiff's prognosis was good. *Id*. at 502-03. Dr. Manyam further assessed that plaintiff had no limitations to physical activities of prolonged standing, sitting, climbing stairs, pushing, pulling, lifting, carrying weights, or looking up and down or side to side. *Id*. at 503.

### 2. Louis Fuchs, M.D.

At the ALJ's request, Dr. Luis Fuchs, M.D., an orthopedic surgeon, completed a medical report and answered interrogatories based on a review of plaintiff's medical file on November 25

2015.  *Id*. at 548-72.  Dr. Fuchs noted that physical and neurological findings during examinations in July 2013, March 2014, June 2015 and September 2015 were within normal limits.  *Id*.  He reported that plaintiff did not meet or equal the criteria of any impairment described in the listing of impairments because the neurological examinations were within normal limits.  *Id*. at 556-57.

Dr. Fuchs completed a medical assessment of work-related activities and opined that plaintiff could continuously lift and carry up to ten pounds, frequently lift and carry up to 20 pounds, sit, stand and walk one hour at a time without interruption, and in an eight-hour workday, could sit for eight hours and stand and walk for four hours.  *Id*. at 549-50. Dr. Fuchs opined that plaintiff could continuously reach, handle, finger, feel and push/pull as well as continuously operate foot controls and balance.  *Id*. at 550-52.  He further opined that plaintiff could continuously work around unprotected heights, moving mechanical parts, and operate a motor vehicle.  *Id*. at 553.  Dr. Fuchs assessed that plaintiff could occasionally climb stairs and ramps, ladders, scaffolds, stoop, kneel, crouch, crawl and occasionally tolerate a work environment with humidity, wetness, extreme heat and cold, and vibrations.  *Id*. at 552-53. Finally, Dr. Fuchs opined that plaintiff could shop and travel without assistance, ambulate without a wheelchair, walker, or cane, walk a block at a reasonable pace, prepare simple meals, care for his personal hygiene, and sort, handle or use paper files. *Id*. at 554.

In April 2016, Dr. Fuchs testified as a medical expert at a hearing on plaintiff's application for disability benefits.  *Id*. at 70-73.  He reviewed additional evidence, namely Dr. Tarleton's treatment notes and Dr. Chinnici's March 2016 chiropractic records that were

submitted into the record after his review of plaintiff's medical file, and Dr. Fuchs testified that

the recent records did not alter his November 2015 opinions.  *Id*. at 71.  When asked by

plaintiff's attorney whether the plaintiff's previous cervical spinal MRI in 2011 was consistent

with Dr. Grossman's August 2015 examination findings, Dr. Fuchs stated it was possible.  *Id*. at

71-73.

### 3.  Vocational Evidence

Esperanza DiStefano, a vocational expert, testified at the April 2016 hearing  on

plaintiff's application for disability benefits.  *Id*. at 73-88, 287-90.  DiStefano classified

plaintiff's past work as a real estate agent, restaurant manager and building inspector, all of

which were considered light exertion, skilled positions. *Id*. at 74-75.  DiStefano stated that

plaintiff performed the building inspector and restaurant manager positions at the medium

exertion level.  *Id*.  When asked by the ALJ if there were jobs in the national economy that could

be performed by a hypothetical individual of plaintiff's age, education, and past work

experience, who could lift and carry up to ten pounds continuously, and up to 20 pounds

occasionally, sit, stand and walk one hour at a time, sit up to eight hours in an eight-hour day,

and stand and walk for four hours in an eight-hour day, continuously reach, handle, push, pull

and balance, and occasionally use stairs, stoop, kneel, crouch and crawl, DiStefano stated that

such an individual could perform plaintiff's past work as a real estate agent, restaurant manager

or building inspector as these jobs are performed in the national economy.  *Id*. at 78-79.

In addition, DiStefano stated that the hypothetical person could perform sedentary work

and could continuously reach, handle, balance, push and pull, and occasionally use the stairs,

stoop, kneel, crouch and crawl. *Id*. at 80-81. Given plaintiff's transferrable skills from his past work, DiStefano reported this hypothetical individual could perform the semi-skilled or skilled sedentary jobs of order filler, information clerk and telephone solicitor, all positions existing in significant numbers in the national economy. *Id*. at 81-83.

### 4. Evidence Submitted to Appeals Council After Relevant Period

By letter dated June 23, 2016, the SSA advised plaintiff that he could submit to the Appeals Council additional evidence that was new and material to the issues considered in the administrative decision. *Id.* at 11. Plaintiff submitted the following medical records from Orlin & Cohen Orthopedic Associates, including the records of Dr. Grossman and Dr. Tarleton, and Dr. Chinnici to the Appeals Council. *Id.* at 18.

A cervical spine MRI study dated May 20, 2016, revealed a small to moderate broad-based right-sided herniated disc at C4-C5; small right sided herniated disc at C5-C6; a bulging disc at C6-C7; a slight disc bulge at C7-T1; degenerative disc disease from C2-T1; straightening and mild reversal of the cervical lordosis; and hemangiomas in some of the vertebral bodies. *Id*. at 23-24.

On June 8, 2016, plaintiff saw PA Caroline Briglio at Dr. Tarleton's office for his neck, back and a review of his MRI results. *Id*. at 29-33. Plaintiff reported his condition was unchanged and that helpful treatments included chiropractic care and medication. *Id*. at 29. An examination indicated spasms in plaintiff's neck, reduced range of motion in his cervical, thoracic and lumbar spine, and PA Briglio assessed lumbago, cervical and lumber degenerative

disc disease, and cervical spine stenosis.  *Id*. at 31-32.   She recommended continued chiropractic treatment, and prescribed Ibuprofen and Tylenol-Codeine.  *Id*.

On July 6, 2017, plaintiff followed up with Dr. Tarleton, who noted that plaintiff was doing the same overall, had traveled back and forth to Florida, assessed thoracic back pain, lumbago, lumbar and cervical degenerative disc disease, cervical spinal stenosis, prescribed Vicodin, advised continued chiropractic treatment, and recommended he obtain a handicapped placard.  *Id*. at 33-35.  In an assessment dated August 8, 2016, Dr. Tarleton diagnosed plaintiff with thoracic back pain, lumbago, lumbar and cervical degenerative disc disease, and cervical spine stenosis.  *Id*. at 21-22.  Dr. Tarleton opined that plaintiff could occasionally lift between five to 20 pounds, stand or walk for one hour total (half an hour without interruption), and sit for one hour total (half an hour without interruption) in an eight-hour workday.  *Id*.  He further opined that plaintiff could never climb or push/pull, occasionally bend, balance, stoop, crouch, kneel, crawl, reach, feel, and handle and should avoid moving machinery and vibration.  *Id*. at 22.  Finally, Dr. Tarleton opined that plaintiff's limitations had been present since 2011.  *Id*.

By letter dated June 29, 2016, Dr. Chinnici set forth a summary of his chiropractic treatment of plaintiff since 2010, and more recently from March 9, 2016 to the present for cervical complaints, and concluded that based on the longevity and the nature of the cervical and lumbar conditions, plaintiff was permanently and totally disabled and unable to work prior to December 14, 2014.  *Id*. at 9.  In addition, he stated that plaintiff's conditions were subject to remissions and exacerbations.  *Id*.

21

**DISCUSSION**

**I.  Standard of Review**

    **A.  Review of the ALJ's Decision**

In reviewing a decision of the Commissioner, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401) (internal quotation marks omitted)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case *de novo.  Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the record"); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review").  Thus, the only issue before the Court is whether the ALJ's finding that plaintiff was not eligible for disability benefits prior to December 31, 2014 was based on "legal error" or is not supported by "substantial evidence."  *Greek,* 802 at 374-75.

22

## B. Eligibility for Disability Benefits

To be eligible for disability benefits under the Social Security Act ("SSA"), a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Burgess v. Astrue,* 537 F.3d 117, 119 (2d Cir. 2008). The SSA further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater,* 221 F.3d 126, 131-32 (2d Cir. 2000).

The SSA has promulgated regulations[3] prescribing a five-step analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if

---

[3] Although the SSA was amended effective March 27, 2017, because the plaintiff's application was filed before the new regulations went into effect, the Court reviews the Commissioner's decision under the earlier regulations. *See Lowry v. Astrue,* 474 F. App'x 801, 805 n.2 (2d Cir. 2012) (applying regulation in effect at the time the ALJ's adjudicated plaintiff's application).

23

the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012). The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Id.*

II.   **Analysis**

A.  **The ALJ's Decision**

At step one, the ALJ determined that plaintiff had not engaged in substantial activity since the initial alleged onset date of March 15, 2011 through his date last insured of December 31, 2014. *Id.* at 43. At step two, the ALJ found that plaintiff's degenerative disc disease of the cervical and lumbosacral spine and cervical radiculopathy were severe impairments. *Id.* At step three, the ALJ found that none of plaintiff's impairments, both singly or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 43-44. The ALJ then assessed plaintiff's residual functional capacity ("RFC") and determined that he had the RFC to perform a range of light work as defined in 20 C.F.R. 404.1567(b). *Id.* at 44. Specifically, the ALJ found that plaintiff was able to lift and carry up to 10 pounds continuously and 11-20 pounds occasionally, was capable of standing and walking one hour at a time and four hours in an eight hour workday, was able to sit one hour at a time and eight hours in an eight hour workday, and was able to continuously reach, handle, balance, push and pull, and occasionally climb stairs, stoop, kneel, crouch and crawl. *Id.* at 44.

At step four, with input from a vocational expert, the ALJ concluded that plaintiff was able to perform past relevant work as a real estate agent, building inspector or restaurant manager, because those jobs, as generally performed, did not require the performance of work-related activities precluded by his RFC. *Id*. at 47. Alternatively, the ALJ proceeded to the final step of the five-step process and determined that, considering plaintiff's age, education, work experience, transferrable work skills, RFC and the vocational expert's testimony, there were jobs that existed in significant numbers in the national economy that plaintiff could perform. *Id*. at 47-48. The ALJ found that plaintiff was, therefore, not disabled under the SSA from the onset of his disability on March 15, 2011 through December 31, 2014. *Id*. at 49.

Plaintiff now challenges the ALJ's decision finding that plaintiff was not disabled during the relevant period, contending principally that the ALJ failed to properly weigh the record evidence. *See* DE 19-1. Moreover, plaintiff asserts that the ALJ failed to assign appropriate weight to the opinions of plaintiff's treating physicians, including orthopedist Dr. Tarleton, and failed to provide good reasons for not crediting their opinions and assigning controlling weight to the opinions of the non-treating sources. *See id*. The Commissioner disagrees and maintains that the ALJ's decision was supported by substantial medical evidence. DE 24.

### B. Weight Accorded Medical Opinions

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c); 416.9279(c). Social Security regulations require

that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician

so long as that opinion is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record." 20 C.F.R. § 404.1527(c)(2); *see Halloran,* 362 F.3d at 32. Medically acceptable

clinical and laboratory diagnostic techniques include consideration of a "patient's report of

complaints, or history, [a]s a diagnostic tool." *Green-Younger v. Barnhart,* 335 F.3d 99, 107 (2d

Cir. 2003); *see Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating

physician is accorded extra weight because the continuity of treatment he provides and the

doctor/patient relationship he develops place[s] him in a unique position to make a complete and

accurate diagnosis of his patient"). Although a treating physician may share an opinion

regarding the severity of the disability, the ultimate decision of whether an individual is disabled

is "reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(1); *see Snell v. Apfel,* 177 F.3d 128,

133 (2d Cir. 1999).

When the ALJ declines to give a treating physician's opinion controlling weight, the ALJ

"must consider various factors to determine how much weight to give to the opinion." *Id.* (citing

20 C.F.R. § 404.1527(d)(2)). These factors include "(i) the length, nature and extent of the

treatment relationship; (ii) the evidence in support of the treating physician's opinion, (iii)

consistency of the opinion with the entirety of the record; (iv) whether the treating physician is a

specialist; and (v) other factors that are brought to the attention of the SSA that tend to support or

contradict the opinion." *Id.*; *see Selian,* 708 F.3d at 418. The ALJ must "comprehensively set

forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d

at 129-30; *see* 20 C.F.R. § 404.1527(d)(2).  Failure to provide "good reasons" for the weight

assigned to a treating physician constitutes a ground for remand.  *Snell,* 177 F.3d at 133; *see*

*Halloran,* 362 F.3d at 32-33 ("We do not hesitate to remand when the Commissioner has not

provided 'good reasons' for the weight given to a treating physicians['] opinion").

Furthermore, the ALJ has an obligation "to recontact a treating physician for clarification

if the treating physician's opinion is unclear."  *McAllister v. Colvin,* 205 F. Supp. 3d 314, 331

(E.D.N.Y. 2016) (internal quotation marks and citations omitted); *see also Calzada v. Astrue,*

753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating

physician's opinion because the medical records from the physician are incomplete or do not

contain detailed support for the opinions expressed, the ALJ is obligated to request such missing

information from the physician").  Such a duty is linked to the ALJ's affirmative obligation to

develop the record.  *Burgess,* 537 F.3d at 129; *see also Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.

1996) ('Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative obligation to develop the administrative record").

By contrast, the opinions of non-treating sources, to wit, a consultative medical doctor or

a non-examining medical expert, should be accorded less weight than treating sources in the

overall evaluation of disability.  *See Selian,* 708 F.3d at 419 ("ALJs should not rely heavily on

the findings of consultative physicians after a single examination"); *see Cruz v. Sullivan*, 912

F.2d 8, 13 (2d Cir. 1990) ("[I]n evaluating a claimant's disability, a consulting physician's

opinions or report should be given limited weight . . . because consultative exams are often brief,

are generally performed without benefit or review of claimant's medical history and, at best, only

27

give a glimpse of the claimant on a single day."); *Hidalgo v. Bowen,* 822 F.2d 294, 297 (2d Cir. 1987) (A "corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis").  Moreover, the SSA regulations point out that even where a treating physician's opinion is not entitled to "controlling weight," the opinion is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *see* Social Security Ruling 96-2p (S.S.A. July 2, 1996) ("In many cases a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight").

C.  **Evaluation of the Medical Evidence**

Upon careful review of the administrative record and the ALJ's decision, the undersigned finds that the ALJ failed to properly evaluate the medical evidence.  As set forth below, the ALJ accorded less than controlling weight to the opinions of plaintiff's treating physicians and assigned greater weight to the non-examining medical expert and consultative examiner, without articulating "good reasons" for not crediting the opinions of the treating physicians, including the opinions of his treating physicians at Orlin & Cohen Orthopedic Associates LLP and the retrospective opinion of Dr. Tarleton.

In his decision, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbosacral spine and cervical radiculopathy.  Tr. at 43.  Notwithstanding this finding, the ALJ found that plaintiff had the residual functional

28

capacity to perform light work as defined in 20 C.F.R. § 404.1567(b)[4] with certain exceptions.

In making this determination, the ALJ gave "great weight" to the non-examining medical expert

Dr. Fuchs as follows:

> At the undersigned's request, medical expert, Dr. Fuchs, reviewed the medical evidence of the record and responded to medical expert interrogatories on November 24, 2015. He stated there is no objective neurological or orthopedic diagnosis in the record and physical examinations on July 17, 2013, March 24, 2014, June 20, 2014 and September 22, 2015 were within normal limits. He noted that claimant does not meet or equal the criteria of a listing because all neurological examinations were within normal limits. He assessed the claimant as being able to lift and carry ten pounds continuously, twenty pounds frequently, sit one hour at a time and eight hours in an eight hour workday, stand and walk one hour at a time and four hours in an eight hour workday, continuously reach, handle, finger, feel, push, pull, operate controls and balance. He stated the claimant can occasionally climb stairs and ramps, ladders, scaffolds, stoop, kneel, crouch, crawl, and occasionally work in environments with humidity and wetness, extreme heat and cold and vibrations. He testified he reviewed Exhibit 15F [Office Treatment Records, dated 3/23/2016, from Dr. Andrew Tarleton] and Exhibit 16F [Office Treatment Records, dated 3/09/2016 to 3/30/2016, from John F. Chinnici, DC] and those records do not impact his opinion set forth in the interrogatory. The undersigned gives great weight to the opinion of Dr. Fuchs as it is based on review of all the medical evidence of record, is consistent with the examination reports, is well reasoned and explained and is considered non-examining medical expert opinion evidence.

*Id.* at 45.

Despite the fact that he never examined plaintiff, the ALJ assigned "great weight" to Dr.

Fuch's determination that plaintiff could, *inter alia*, lift and carry ten pounds continuously,

twenty pounds frequently, continuously push and pull, sit eight hours in an eight-hour workday,

and walk and stand four hours in an eight hour work day. This opinion is at odds with those of

---

[4] According to the SSA, light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *Id.*

the treating physicians, who found plaintiff's exertional abilities to be much more limited. The Second Circuit has made clear that "the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisors' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan,* 898 F.2d 293, 295-96 (2d Cir. 1990); *see Filocomo v. Chater,* 944 F. Supp. 165, 169 n.4 (E.D.N.Y. 1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight"); *see also Selian,* 708 F.3d at 419; *see Cruz*, 912 F.2d at 13; *Hidalgo,,* 822 F.2d at 297.

In addition, the ALJ gave "some weight" to Dr. Manyam, a non-treating source, who performed a consultative examine on plaintiff on March 24, 2014 stating in relevant part:

> Dr. Manyam diagnosed neck pain secondary to degenerative arthritis, musculoskeletal pain and hypertension and said the claimant's prognosis was good. He assessed the claimant as having no limitations to physical activities of prolonged standing, sitting, climbing stairs, pushing, pulling, lifting or carrying weights or looking up and down or side to side. The undersigned gives his opinion some weight as it is based on a thorough physical examination of the claimant.

*Id.* at 45-46. The Second Circuit has instructed, however, that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian,* 708 F.3d at 419; *see Giddings v. Astrue,* 333 F. App'x 649, 652 (2d Cir. 2009) (holding a consultative physician's opinion is generally entitle to "little weight").

By contrast, the ALJ accorded less weight or no weight to the opinions of plaintiff's treating physicians and failed to set forth good reasons for discounting their opinions.  First, with respect to Dr. Diaz, one of plaintiff's treating physicians, the ALJ stated:

> On December 16, 2013, Dr. Diaz opined that the claimant can lift and carry eight to ten pounds occasionally, stand and walk three to four hours in an eight hour workday, and one hour without interruption, sit four hours in an eight hours workday and one hour without interruption, and occasionally climb, stoop, kneel, balance and crouch.  The undersigned gives the opinion some weight but less weight than Dr. Fuchs and Dr. Manyam's as the period of time that the assessment refers to is not defined and it is not fully consistent with the medical evidence of record.

*Id.* at 46.  To the extent that Dr. Diaz's assessment was incomplete because the period of time "is not defined," the ALJ had an obligation to contact Dr. Diaz for clarification in order to carefully weigh it.  *See McAllister,* 205 F. Supp. 3d at 331; *see also Calzada,* 753 F. Supp. 2d at 277.  Specifically, regulations promulgated by the SSA require the ALJ to "seek additional evidence or clarification" from treating sources whose reports contain "a conflict or ambiguity that must be resolved" or are "inadequate for [the Commissioner] to determine whether [the claimant] is disabled."  20 C.F.R. § 404.1512(e); *see Rosa,* 168 F.3d at 79 (the ALJ "cannot reject the treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record").  This is because an "ALJ generally has an affirmative obligation to develop the administrative record," which "exists even when the claimant is represented by counsel."  *Perez,* 7 F.3d at 47.

Next, even though Dr. Chinnici had treated plaintiff prior, during and after the relevant period for chiropractic care, apart from the ALJ's reference to Dr. Chinnici's March 2016 reports which noted improvement in plaintiff's cervical spine range of motion post treatment, the ALJ did not address or mention any of Dr. Chinnici's opinions during the relevant period, nor the

weight he assigned to them.  *See Burgess,* 537 F.3d at 129-30; *Snell,*177 F.3d at 133; *see also Halloran,* 362 F.3d at 32-33.

Moreover, the ALJ failed to assign any weight to the opinions of plaintiff's physicians at Orlin & Cohen Orthopedic Associates LLP who treated him during and after the relevant period notwithstanding the fact that their opinions were inconsistent with non-treating sources.  With respect to Dr. Grossman, the ALJ referenced a May 20, 2014 x-ray which showed disc space narrowing, mild degenerative disc disease and spurring at L4-L5, diagnosed lumbago and degenerative disc disease of the lumber spine, and recommended conservative treatment.  *Id.* at 46.  In addition, the ALJ noted Dr. Grossman's report during a July 29, 2014 examination that plaintiff's range of motion in his back was diminished; however, the ALJ did not note that the range of motion in plaintiff's neck was also diminished nor did he reference that x-rays performed that day continued to show disc space narrowing, degenerative disc disease of the subaxial spine worst at C5/6 and C6/7 with osteophyte formation.  *Id.*; *compare with id.* at 542-44.  While the ALJ referenced plaintiff's follow up appointment with Dr. Grossman nine months after the relevant period on September 22, 2015, stating that Dr. Grossman noted a limited range of motion of the cervical spine with spasm but with full strength testing, the ALJ did not discuss the weight, if any, he assigned to any of Dr. Grossman's opinions.

Significantly, at the ALJ hearing on April 14, 2016, when plaintiff's attorney asked Dr. Fuchs whether the findings in the previous 2011 MRI of plaintiff's cervical spine, *viz.* degenerative disc disease from C5 to T1 associated with narrowing of the neural foramen and a reversal of the normal cervical lordotic curve, might account for muscular spasms which could

produce pain, Dr. Fuchs acknowledged that it could.  *Id*. at 71-72.  Plaintiff's attorney then asked

Dr. Fuchs whether plaintiff's previous MRI in 2011 could account for Dr. Grossman's findings

in August 2015 of bilateral trapezial spasm, bilateral rhomboid spasm, bilateral paracervical

spasm and range of the cervical spine as "very limited in all directions with pain," and again Dr.

Fuchs answered in the affirmative.  *Id*. at 73.

> With respect to Dr. Tarleton, the ALJ stated the following:

> On March 23, [2016], Dr. Tarleton stated the claimant had a very limited range of the
> cervical spine in all directs and a diminished range of motion of the thoracic and lumbar
> spine.  His assessment is contradicted by John Chinnici who stated on March 14, 2016
> and March 25, 2016 that the claimant's cervical spine range of motion had improved. In
> addition, it is almost fifteen months after the claimant's date last insured and is not
> probative to the claimant's functional ability on or before December 31, 2014.

*Id.* at 47.  The ALJ correctly notes that Dr. Tarleton was not plaintiff's treating physician during

the relevant time period, and the undersigned observes that Dr. Chinnici's assessment was also

made after the date last insured and referred to range of motion post-treatment.  *Id.* at 578, 580.

Nonetheless, "[a] treating physician's retrospective medical assessment of a patient may be

probative when based upon clinically acceptable diagnostic techniques," and should have been

considered.  *Perez,* 77 F.3d at 48; *see Monette v. Astrue,* 269 F. App'x 109, 113 (2d Cir. 2008)

("the fact that a treating physician did not have that status at the time referenced in a

retrospective opinion does not mean that the opinion should not be given some, or even

significant weight"); *Dousewicz v. Harris,* 646 F.2d 771, 774 (2d Cir. 1981) (holding a

subsequent treating physician's opinion was "still entitled to significant weight," even though he

"did not treat the [claimant] during the relevant period"); *see also McCallister,* 205 F. Supp. 3d

at 332 ("opinions of treating physicians are binding in the absence of substantial evidence to the contrary even if the treating physican[s'] evaluations [were] made after the last date on which the claimant met the special earnings requirement") (internal quotation marks and citations omitted); *Wenk v. Barnhart,* 340 F. Supp. 2d 313, 322 (E.D.N.Y. 2004) ("[t]he 'treating physician rule' applies to retrospective diagnoses which relate to some prior time period during which the diagnosing physician may or may not have been a treating source").

Further, to the extent that the ALJ discounted the opinions of the treating physicians because plaintiff "was treated only conservatively," *id.* at 47, the Second Circuit has made clear that the opinion of the treating physicians may not be discounted because they recommended a conservative treatment regimen. *Burgess,* 537 F.3d at 129 ("The ALJ and the judge may not impose[] their [respective] notion[s] that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered ."); *Shaw,* 221 F.3d at 134 (ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion").

Finally, it is unclear on the face of the ALJ's decision whether the ALJ considered, or was even aware of, the applicability of the treating physician rule as the decision makes no reference to the rule nor to the relevant factors that must be considered thereunder.  For example, the ALJ did not discuss the length, nature and extent of the treating relationships, the evidence in support thereof, or the consistency of the opinions with the entirety of the record.  Instead, the ALJ appears to have based his findings on the opinions of the non-treating sources and plaintiff's testimony that he can lift ten to twenty pounds, does not need a cane, was able to drive from New

York to Florida, was a gourmet cook and did not get orthopedic treatment while living in Florida between 2013 and 2014.  *Id.* at 44-45, 47.  However, with respect to plaintiff's testimony, the ALJ's decision fails to note plaintiff's limitations in completing his daily activities, including his testimony that he was unable to sit or stand for ten or fifteen minutes, was able to lift ten to twelve pounds and walk three to four minutes, or his explanation that he did not get treatment in Florida because of insurance restrictions.  *Id.* at 66-69, 100.

In sum, the ALJ failed to provide "good reasons" for declining to accord controlling weight to the treating physicians' opinions.  *Snell,* 177 F.3d at 133.  Such failure "by itself warrants remand."  *Selian,* 177 F.3d at 133.  Accordingly, the undersigned respectfully recommends that the matter be remanded to allow the ALJ to properly develop and clarify his reasons for his decision.[5]

## CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that the district court deny plaintiff's motion for judgment on the pleadings, deny the Commissioner's cross-motion for judgment on the pleadings, and remand the case to the ALJ for further proceedings consistent with this Report and Recommendation.

---

[5] In light of the recommendation that the case be remanded based on the ALJ's errors regarding the treating physician rule, the undersigned does not address plaintiff's other argument that the ALJ failed to consider his subjective complaints.  DE 19-1.  However, the undersigned further respectfully recommends that upon remand, the ALJ reconsider plaintiff's testimony and credibility after the proper application of the treating physician rule.  *See Vlado v. Berryhill,* No. 16-CV-794 (MKB), 2017 WL 1194348, at *13 n.10 (E.D.N.Y. Mar. 29, 2017); *McAllister,* 205 F. Supp. 3d at 330 n.3; *Morris v. Colvin,* No. 15-CV-5600 (JFB), 2016 WL 7235710, at *10 (E.D.N.Y. Dec. 14, 2016).

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court of Court of Appeals.**  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Dated:  Central Islip, New York
        August 29, 2018

                                           /s/ Gary R. Brown
                                          GARY R. BROWN
                                          United States Magistrate Judge

36